```
FILED & JUDGMENT ENTERED
        Steven T. Salata



        March  11  2024


   Clerk, U.S. Bankruptcy Court
  Western District of North Carolina
```

J. Craig Whitley
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **BK RACING, LLC** | ) | Case No. 18-30241 |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| **MATTHEW W. SMITH, the sole** | ) | |
| **Manager for BK RACING, LLC,** | ) | |
| | ) | |
| Plaintiff. | ) | |
| | ) | Adversary Proceeding |
| v. | ) | No. 20-03057 |
| | ) | |
| **MICHAEL DISEVERIA and** | ) | |
| **FOXBORO FINANCIAL** | ) | |
| **SERVICES, LLC,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### MEMORANDUM OPINION

This adversary proceeding was brought by Matthew W. Smith ("Smith" or "Plaintiff"),

the sole manager of the reorganized Debtor, BK Racing, LLC ("BK Racing" or "Debtor")

(collectively, the "Estate") against Defendants Michael DiSeveria ("DiSeveria") and Foxboro

Financial Services, LLC ("Foxboro", collectively the "Defendants").  After a protracted and

difficult discovery period, the case was tried on October 5, 2023.  The Estate was represented by Andrew Houston and Caleb Brown of Moon, Wright, and Houston.  Defendants were represented by John Woodman and David DiMatteo of Essex Richards.

A follow-on hearing was held November 14, 2023 to consider the admissibility of disputed exhibits and related testimony.  The matter was then taken under advisement.  After a review of the parties' stipulations, additional evidence presented, and the applicable law, this Court enters this trial decision.

## STATEMENT OF THE CASE

Smith filed this adversary proceeding on September 30, 2020.  He seeks to avoid and recover four prepetition transfers made from BK Racing to DiSeveria, totaling $227,000 (the "Transfers").  The Transfers were made between December 21, 2016 and April 6, 2017.

Plaintiff's Position.  Smith contends the Transfers were equity distributions to or for the benefit of the Defendants as minority owners, officers, and insiders of the Debtor.  Smith believes that BK Racing made the Transfers with an actual intent to hinder, delay, or defraud its creditors within the meaning of 11 U.S.C. § 548(a)(1) ("Actual Fraudulent Transfer").

Smith alternatively alleges the Transfers were constructively fraudulent under 11 U.S.C. §548(a)(2).  Being distributions to equity, Smith contends that BK Racing received less than reasonably equivalent value in exchange for the Transfers ("Constructively Fraudulent Transfer").

Smith also asserts that the Defendants are either initial or immediate transferees under 11 U.S.C. § 550(a), such that he can recover the voided transfers from either defendant.

Smith makes the same essential contentions under N.C. GEN. STAT. § 39-23.1, the North Carolina statutory analog to Section 548.

Defendants' Position. The Defendants deny most of Smith's assertions.  They say the

Transfers were not equity distributions, but rather were repayments of informal, short-term loans made by DiSeveria to BK Racing. (the "Deposits"). Thus, the Transfers were not made to "hinder, delay, or defraud" the Debtor's creditors, but—on the contrary—to repay a creditor. They are not "actual fraudulent transfers."

As loan repayments, the Defendants argue that the Transfers were for reasonably equivalent value and may not be avoided as constructively fraudulent transfers. Finally, to the extent that the court finds the transfers to be avoidable, the Defendants assert defenses under 11 U.S.C. § 548(c), arguing that the Defendants (DiSeveria, in particular) acted in good faith and gave value to the Debtor in exchange for the Transfers.

## BACKGROUND

BK Racing, LLC is a North Carolina limited liability company formed in 2011. Between 2012 and 2018, BK Racing owned and operated a NASCAR Cup Series race team. Over that short lifespan, BK Racing lost an inordinate sum of money, potentially as much as $44 million.[1] When threatened by a secured creditor's attempt to have a receiver appointed for the company, BK Racing filed a "bare bones" Chapter 11 petition[2] in this judicial district on February 15, 2018.

BK Racing acted as Debtor in Possession ("DIP") in the case for a mere six weeks. The bankruptcy case was filed during the week of the Daytona 500 race, the official start of the NASCAR season. It is evident that the bankruptcy filing was not well-considered. BK Racing's bankruptcy counsel, Henderson, had represented the company for less than a day. Henderson had not even met its indirect owners in person. BK Racing was not prepared to prosecute the "first day" motions required in a chapter 11 case, nor were its principals. At that time, the indirect owner/manager/operator Ron Devine was running the company. He was in Daytona and

---

[1] The aggregate amount of claims filed in the case.
[2] The petition that lacked most of the required statements and schedules.

was much more concerned with racing than addressing legal requirements or attending court hearings.

Thus, for six weeks, the Debtor raced while ignoring its legal responsibilities as a DIP.  It operated without cash collateral authority and without workers compensation or liability insurance.  It also failed to meet the most basic bankruptcy requirements like filing bankruptcy schedules and a creditor matrix.[3]  As a result, Smith was appointed as operating Chapter 11 trustee on March 30, 2018.

Despite being charged with managing BK Racing's operations and affairs, Smith had few financial resources by which to accomplish his task.  Smith also lacked the necessary records and financial information.  While the BK Racing shop and some few records were located in Charlotte, North Carolina, Ron Devine managed the company's affairs from his office in Northern Virginia.  Although the bankruptcy laws require management to turn over a debtor's records and recorded information to the trustee, Smith received little cooperation from the Devines and almost no voluntary production of the Virginia records.

Smith operated BK Racing for most of the race season and until the team assets could be sold.  A sale occurred on August 24, 2018.  *Order Granting Amended Motion to Sell Race Team Assets*, Case No. 18-30241, Doc. 191 (Aug. 24, 2018).

Later, under the plan of liquidation confirmed on February 11, 2020, Smith was appointed sole manager of the reorganized Debtor.  *Findings of Fact, Conclusions of Law, and Order Confirming Trustee's First Amended Plan*, Case No. 18-30241. Doc. 408 (Feb. 11, 2020).  He was then tasked with investigating and pursuing litigation claims for the benefit of the Debtor's creditors.

---

[3] A matrix of creditors is necessary in order to notice a Section 341 creditors meeting and to establish case deadlines.

The investigation proved tortuous.  One of the reasons the Schedules were never filed by the DIP was because Ron Devine did not want to disclose transfers made to insiders.  From the start, Ron Devine attempted to dictate to Smith how the bankruptcy case would be administered. Among other things, in an email dated May 31, 2018, Ron Devine threatened Smith that should he take the creditors' side in the case and seek to sell BK Racing's NASCAR Charter, "we'll let the lawyers fight forever."  *Order Granting Plaintiff's Renewed Motion to Compel and Imposing Sanction, Including Entering Default Judgment*, Case No. 20-03014, Doc. 81 p. 7 (Aug. 23, 2023).  Ron Devine further threatened, "if you start to support [the Bank], I will become your number 1 enemy."  *Id*.

As promised, Ron Devine quickly came to view Smith as his enemy.  Ever since, Ron Devine and those allied with him have attempted to thwart Smith's efforts to investigate BK Racing's financial affairs and its administration.

The Woeful State of the Debtor's Books and Records.  Before the case could proceed, it was necessary for Smith as Trustee to create a creditor's matrix and to file the missing bankruptcy schedules and statements.  Smith discovered that BK Racing's records from the Charlotte shop were chaotic and often inaccurate.  Even more significant, many of its financial records and business emails were missing.

The Debtor kept a general ledger, journal, balance sheets, and financial statements in its QuickBooks accounting records (collectively, "QuickBooks").  Smith has access to those records, but they are, once again, neither complete nor entirely accurate.

It is known that Ron Devine and his lieutenants managed BK Racing from his offices in Northern Virginia.  To do so, they used the email system of one of his other companies, A&R Foods.  Smith has spent much time attempting to obtain records and emails from BK Racing's management and from the Defendants.  This has been an exercise in legal tooth pulling with

limited success.[4]   One critical source of information that was not available to Smith was the A&R Foods email system which has been described previously in this case as being housed on a missing or broken server.  *See Order Entering Default Judgment*, Case No. 20-03014, Doc. 81, pp. 55-56.

Smith's investigation revealed a complicated entanglement between BK Racing, Ron Devine, and Devine's other businesses and business associates.  A significant amount of money was transferred from the Debtor to those persons, several million dollars of which were transferred by the Debtor in the year and a half before the bankruptcy petition.  Among these are the Transfers at issue in this action.

The Related Cases.   After completing his investigation, or rather after obtaining what information he could about BK Racing's affairs, Smith filed several adversary proceedings. These were brought against persons and corporations that had business dealings with BK Racing. Among these actions, Smith filed a fraudulent transfer/alter ego action against both Devines and their other businesses and trusts (*Smith v. Devine*, Case No. 20-03014); another fraudulent transfer action against Ron Devine's personal assistant Nancy O'Haro, a self-described "lender" to BK Racing and other Devine companies (*Smith v. O'Haro*, Case No. 20-03007); and the present adversary proceeding against DiSeveria and Foxboro (collectively, the "Related Cases").

The Related Cases bear several unfortunate similarities.  They all involve prepetition transfers of money made by BK Racing in the runup to BK Racing's bankruptcy.  In each, the defendants argue the transfers repaid short-term loans made to the Debtor.  However, these "loans" are undocumented, they do not bear interest, and there are no contemporaneous supporting records or emails pertaining to the same.  These "loans" are simply a few checks and wire transfers from one side to the other, and a vague, oral account by Ron Devine and the

---

[4] Save for a few select emails from Devine's inbox.

Related Case defendants as to the circumstances under which the monies were paid.  *See e.g.,*
*Order Granting Plaintiff's Renewed Motion for Sanctions and Entering Default Judgment*, Case
No. 20-03007, Doc. 136, p. 8 (Jan. 2, 2024).

Additionally, all of the defendants either are or share a close relationship with Ronald
Devine: family, friends, wholly owned companies, family trusts, etc.  Ron Devine has been
intimately involved in the defense of all three actions and the Related Case defendants are all
represented by the same law firm.

One final unfortunate similarity in the Related Cases is that the defendants have
repeatedly failed to make discovery.  Most of these failures relate to documents and
contemporaneous emails from the time periods of the transfers.  These emails have not been
disclosed and/or not produced.  *See e.g., Order Referencing Second Order on Plaintiffs Motion
to Compel*, Case No. 20-03057, Doc. 79 (Aug. 25, 2022).

After several orders to compel failed to rectify these failures, the Devine Defendants and
then O'Haro were defaulted for their inaction.  *See e.g.*, *Order Entering Default Judgment*, Case
No. 20-03014, Doc. 81; *Order Entering Default Judgment*, Case No. 20-03007. Doc. 136.

Discovery has been unduly difficult in the present action, as well.  Here, it has been
necessary to issue three separate Orders to Compel in order to obtain discovery, although, as best
as one can tell, the relevant discovery and documentation have finally been provided.

## FINDINGS OF FACT

Well before creating the Debtor and among many other business ventures, Ron Devine
was a Burger King franchisee in Virginia.  DiSeveria also owned fast-food restaurants in the
Virginia and Maryland area, including several Burger King restaurants.  The two men met
through Burger King and became friends.

In 2012, Ron Devine approached DiSeveria about investing in a stock car racing team he was forming, BK Racing. Initially, DiSeveria was not interested. He was not a race fan and knew little about the sport. However, when Devine told him that Burger King Corporation might sponsor the race team, DiSeveria reconsidered. DiSeveria knew stock car racing is a very popular sport within Maryland and should Burger King become a team sponsor, an investment by DiSeveria in the Debtor would be a "natural fit" for his restaurants.

To that end, in 2012 DiSeveria purchased a 4 % membership interest in BK Racing, paying the sum of $380,000. DiSeveria chose to make his investment through an existing, wholly-owned corporation, Foxboro. Foxboro was a shell company, an inert LLC with no employees, operations or corporate governance. Foxboro ultimately sold its membership interest in mid-December of 2016.

The majority interest in BK Racing was indirectly owned by the Devines through a company known as Virginia Racer's Group ("VRG"). Over BK Racing's lifespan, VRG held between 76%-80% of its membership interests. The rest of the membership interests in BK Racing were held by other business acquaintances of Ron Devine. Technically, VRG was the operating manager of the Debtor. However, practically, Ron Devine operated and controlled BK Racing.

Upon investing in BK Racing, DiSeveria was made Vice President and Assistant Secretary of the Debtor. *Complaint for Avoidance and Recovery of Fraudulent Transfers*, Case No. 20-03057, Doc. 1 ¶ 22 (Sep. 30, 2020). While he denies this, the weight of the evidence indicates that DiSeveria remained an officer of BK Racing through the date of bankruptcy. However, with the one exception discussed below, it does not appear that DiSeveria or Foxboro were ever actively involved in BK Racing's operations or management. This was simply a passive investment by DiSeveria in a friend's business.

8

The Deposits and Transfers.  Between January 4, 2017, and April 25, 2017, DiSeveria made a series of a deposits (each a "Deposit," and collectively, the "Deposits") into the Debtor's bank accounts:

| Date | Amount | Format |
|------|--------|--------|
| 1/4/2017 | $75.00 | Check #4031 |
| 1/5/2017 | $75,000.00 | Check #4032 |
| 2/14/2017 | $66,000.00 | Wire |
| 4/13/2017 | $33,750.00 | Check #4095 |
| 4/25/2017 | $30,000.00 | Check #4101 |

Beginning shortly after the first Deposit, BK Racing began making a series of payments to DiSeveria from its operating accounts, as set forth in the chart below (each a "Transfer," and collectively, the "Transfers"):

| Date | Amount | Format |
|------|--------|--------|
| 12/21/2016 | $55,000.00 | Check #9929 |
| 02/06/2017 | $75,000.00 | Check #20107 |
| 03/13/2017 | $66,000.00 | Check #20271 |
| 04/06/2017 | $81,000.00 | Check #20420 |

DiSeveria testified that each of the Deposits was a short-term advance (a loan) to the

Debtor.    He says each Transfer repaid the Deposit immediately preceding the Transfer.[5]

DiSeveria further testified that he made two (2) more loans to BK Racing ($55,000.00 on or

about November 30, 2016, and $80,000 on or about March 29, 2017) which were never repaid.

DiSeveria testified that on each occasion he was approached by Ron Devine who asked

him to make a short-term loan to the Debtor to help cover its operating expenses.    Winter is the

"off season" for NASCAR, meaning many race teams lack cash flow.    DiSeveria says he agreed

in every instance because 1) he wanted to support his friend and 2) as a small businessman in the

restaurant industry, he was sympathetic to the fluctuations of cash flow.    However, according to

DiSeveria, his willingness to lend ended after BK Racing failed to repay his last loans.    After this

point, DiSeveria refused to extend any more loans to the Debtor.    However, DiSeveria says that

even then he did not realize that BK Racing was nearing bankruptcy.

Smith testified at length about the financial information available to him and why, based

upon the Debtor's then-existing financial circumstances, the Deposits do not appear to be loans.

Rather, Smith surmises the Deposits were equity infusions and the Transfers were equity

distributions, a return of capital.    Because BK Racing provided K-1s to Foxboro/DiSeveria each

year reflecting large operating losses,[6] Smith maintains that Defendants were fully aware of the

company's precarious financial position.    In fact, these financial problems were, in Smith's

opinion, the reason for the Deposits.

On this record, there is room for either contention.    There are no promissory notes,

written loan agreements, or security agreements of any sort to establish that the Deposits were

loans.    There were no fixed maturity dates associated with the challenged transactions, no fixed

repayment dates or schedules, and no fixed rate of interest was charged in connection with the

---

[5] If true, this would insulate the Defendants from liability on the Transfers made more than 1 year before bankruptcy and hence are not preferences under Section 547.    *See* 11 U.S.C. § 547(b)(4)(B).
[6] From at least 2014 through 2017, the Debtor issued annual K-1 statements to Foxboro for each tax year (the "K-1s").

challenged transactions. The Defendant received no collateral from the Debtor to secure the repayment of the deposits in question. No sinking fund was established or required for the repayment of the Deposits in question and no periodic interest payments were made.

On the other hand, there are no equity sale agreements, no equity redemption agreements, no stock certificate, nor cancelled stock certificates that might establish that the challenged transactions were equity distributions.

Finally, there are no pertinent emails, written correspondence or any other contemporaneous communications concerning the challenged transactions from which we might gauge the participants' intentions. We have only the checks and bank statements, BK Racing's incomplete and often inaccurate Quickbooks, and DiSeveria's parole testimony. Thus, the parties are free to project their own conclusions as to what should be made of these transactions.

The Debtor's Financial condition at the Time of the Transfers. One of the few certainties in this case is that BK Racing was grossly undercapitalized and insolvent at the time of the Transfers. The parties have so stipulated. *Order Approving Parties' Stipulations*, Case No. 20-03057, Doc. 91, p. 7 (Apr. 14, 2023).

In particular, between August of 2014 and December of 2017, the Internal Revenue Service filed twenty-four tax liens against the Debtor on account of its unpaid payroll tax obligations (the "Federal Tax Liens"). The Federal Tax Liens total nearly $3M. These tax obligations were unpaid at the time of the challenged transactions.

Meanwhile, on May 31, 2016, and May 16, 2017, the Debtor executed unconditional guarantees in favor of Union Bank & Trust ("UBT") (the "Guarantees"). The Debtor also pledged its assets to secure that guaranty on May 31, 2016, November 3, 2016, and May 15, 2017 (the "Security Agreements"). UBT perfected its security interests by filing: (a) a UCC financing statement with the North Carolina Secretary of State on June 7, 2016, and (b) an

amended UCC financing statement on May 23, 2017 (collectively, the "UCCs").

Shortly before the events at issue in this action, on January 3, 2017, creditor Race Engines Plus, LLC ("REP") received an arbitration award against the Debtor in the Superior Court of Cabarrus County in the amount of $1,462,648.00, plus interest (the "REP Action"). *See Statement of Financial* Affairs, Case No. 18-30241, Doc. 122, p.83 (May 9, 2018); *see also BK Racing, LLC v. Race Engines Plus, LLC et al, LLC, et al*., Case No. 14-CVS-3618 (Jan. 3, 2017).

In addition to these, forty-four priority creditors and three hundred general unsecured creditors filed claims in the bankruptcy case. From what Smith could glean from the company's books, on the date of bankruptcy, BK Racing had approximately $1.5M in assets as compared to $37.7M in liabilities. *Statement of Financial Affairs*, Case No. 18-30241, Doc. 122 (May 9, 2018). More than $44M in claims have been filed by creditors in this case.

The Defendants say that they were unaware of the Debtor's poor financial condition at the time of the Transfers because they were uninvolved in BK Racing's management. This is not an entirely credible assertion. As noted, Defendants did not actively participate in the management of BK Racing. Still, even by the Defendants' account, Ron Devine was asking DiSeveria on a monthly basis for money. Second, the K-1s issued by BK Racing to Defendants from 2014 to 2017 tax years show large losses. They show Foxboro's membership interest in BK Racing to have a negative value as early as 2013 (-$135,382), and this deficit only became a deeper red going forward.

When presented with this documentation, DiSeveria suggested that because his accountant prepares his tax returns, he remained unaware of Foxboro's negative capital account and of BK Racing's financial distress. This does not stand up: the K-1s were issued to him, not his accountant. Moreover, in an email exchange between DiSeveria and Devine dated October 30, 2014, the former expresses his amazement that Devine could keep the business operating

with no profits.  Thus, the Defendants were generally aware of the Debtor's financial condition, before, during, and after the Transfers.

<u>The Alleged Sale of Foxboro's Interest.</u>  According to DiSeveria, Foxboro sold its interest in BK Racing in mid-December of 2016 and that ended the Defendants' involvement in the company.  In support, Defendants presented a written sale agreement transferring Foxboro's membership interest to VRG for the sum of $2,500.  Smith notes the signatures on the Sale Agreement are not dated; nor are they notarized.  Because the Sale Agreement is "as of December 17, 2016," and it was not produced until late in the discovery period, Smith suspects the document is a forgery.

In this case, anything is possible.  However, DiSeveria's story rings true.  He testified that the parties met on December 16 and made the deal.  The original plan was to have Foxboro sell its interest back to BK Racing, making this effectively a redemption.  However, at that same meeting, Ron Devine announced that he wanted to make VRG the purchaser.  Thus, the written agreement had to be changed, and DiSeveria says it was signed a couple of days later. DiSeveria's account appears generally credible as to the sale of the membership interest and is formally adopted.

However, the weight of the evidence suggests that, notwithstanding the sale, DiSeveria remained an officer of BK Racing and was such on the dates of the Transfers.

## DISCUSSION

Subject matter jurisdiction over this dispute lies under 28 U.S.C. § 1334 and the General Order of Reference entered by the United States District Court for the Western District of North Carolina on July 30, 1984.  This is a "core" proceeding under 28 U.S.C. § 157.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## I. Evidentiary Disputes

Before discussing the parties' substantive arguments, we must first address the post-trial evidentiary objections.  The two parties used a unified book of exhibits and were able to stipulate to the authentication and admission of most (94 exhibits in total).  Only thirteen of Smith's exhibits are in dispute.  Defendants maintain that Exhibits 14, 17, 18, 24, 25, 28, 35, 37, and 52 are inadmissible hearsay ("Hearsay exhibits").  *Defendant's Memorandum of Law Regarding Contested Trial Exhibits*, Case No. 20-03057, Doc. 128, p. 2 (Nov. 13, 2023).  They further contend that Exhibits 19, 20, and 21 reflect "purported" transactions which are themselves irrelevant to this case ("Transaction exhibits").  *See id*. at p. 3.

a. The Hearsay Exhibits (Exhibits 14, 17, 18, 24, 25, 28, 35, 37, and 52).

Relevant evidence is generally admissible unless prohibited otherwise.  *See* Fed. R. Evid. 402.  Evidence is relevant if it is probative and of consequence.  *See* Fed. R. Evid. 401.  However, relevant evidence may be excluded if the probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.  Fed. R. Evid. 403.

Hearsay, an out of court statement offered to prove the matter asserted, is inadmissible unless provided for otherwise in the federal statute, the federal rules of evidence, or by the Supreme Court.  Fed. R. Evid. 801(c); Fed. R. Evid. 802.

That said, the parties contentions are considered in turn:

*1. Exhibit 14; Section 341 Meeting Transcript*

The Section 341 Meeting Transcript reflected the testimony of Ron Devine on behalf of the Debtor.  In relevant part, Devine testified that all investments in BK Racing were initially booked as loans (sic).  He also testified that BK Racing had not made any prepetition transfers to insiders (sic).  Smith offers this testimony first to prove the truth of the matters asserted, to-wit:

14

1) whether the Transfers to DiSeveria were returns of capital and 2) whether Devine made false statements at the creditors' meeting in order to conceal those (and other) insider transfers.

Devine is a nonparty in the present action. He was not present at trial and, on this occasion at least, he did not testify.[7]

"Testimony of a nonparty witness that was given at a prior hearing is, when offered for its truth, hearsay." *Patterson v. County of Oneida*, 375 F.3d 206, 219–20 (2d Cir. 2004). *See generally* Fed. R. Evid. 801(c). Such prior testimony is "not admissible at a subsequent trial under the exception for 'former testimony' unless the declarant is unavailable and the party against whom it is offered at the subsequent trial [or the party's predecessor in interest] 'had an opportunity and similar motive' at the prior hearing 'to develop the testimony by direct, cross, or redirect examination.'" *O'Brien v. City of Yonkers*, No. 07-CV-3974 KMK LMS, 2013 WL 1234966, at *7 (S.D.N.Y. 2013) (quoting *Patterson v. County of Oneida*, 375 F.3d at 219-20 (internal citations omitted).

Devine was legally "unavailable" at trial, in that he is not a party in this action and he resides in Northern Virginia and is beyond the reach of Plaintiff's subpoena. Meanwhile, the Defendants were not present at the earlier creditors meeting and had not participated in the bankruptcy case at that time. Insofar as it goes, under Rule 801(c), Devine's Section 341 testimony may not be considered for the truth of the statements made.

Smith offers two alternative arguments for admissibility. First, he says this testimony evidences the Devine/Debtor's intent (to conceal) or mental state and is admissible under the Federal Rules of Evidence ("FRE") Rule 803(3). I disagree. That subpart of Rule 803 pertains to the declarant's "then-existing state of mind (such as motive, intent, or plan) . . . ." Fed. R.

---

[7] Devine had been a witness in prior evidentiary hearings conducted in this and the Related Cases, and being on the Witness List, Smith assumed he would be again. In fact, Devine traveled with DiSeveria to the trial, was staying in the same hotel, and doubtless would have been available had the Defendants required his testimony. However, he was not subpoenaed and ultimately he did not attend the trial.

Evid. 803(3).  Devine's 341 testimony described BK Racing's accounting practices at the times the investments were made, not Devine's state of mind at the creditors' meeting years later.  His testimony about transfers is closer in time, but still not a clear reflection of his state of mind at the time of the meeting.

Second, Smith argues that this evidence is admissible under the residual hearsay exception of Rule 807.  "The residual hearsay exceptions . . . accommodates ad hoc instances in which statements not otherwise falling within a recognized hearsay exception might nevertheless be sufficiently reliable to be admissible at trial."  *Idaho v. Wright*, 497 U.S. 805, 817 (1990).

This is an intriguing contention.  Devine's 341 testimony has been previously admitted into evidence several times in this Chapter 11 case without objection, including in the Related Cases.  *See Exhibit List*, Case No. 20-03057, Doc. 41 (Jan. 4, 2022); *Notice of Filing of Exhibits*, Case No. 20-03014, Doc. 120-20 (Jan. 30, 2023).  On those occasions, Devine testified at length and was subjected to cross examination.  In each instance he testified under oath and his testimony was recorded by a court official.  He was also examined at the creditors meeting by the Bankruptcy Administrator, a government official charged with conducting such examinations, as well as by individual creditors' counsel, and by BK Racing's attorney.  Devine knew that his other companies and O'Haro, his friend and personal assistant, had received prepetition transfers like those made to the present Defendants.  While testifying, both he and the Debtor had the opportunity and the incentive to develop and clarify the record as to the manner in which investments were recorded by BK Racing and about its prepetition transfers.  As the Related Cases were filed contemporaneously, on several of those occasions, the attorneys representing today's Defendants were representing Devine and the other Related Case Defendants in the other actions.

The Fourth Circuit has noted that in applying the Rule 807 "residual exception," the focus is on whether the declarant's testimony from the prior hearing had "equivalent circumstantial guarantees of trustworthiness." *United States v. Clarke*, 2 F.3d 81, 84 (4th Cir. 1993). In *Clarke*, the Four Circuit upheld the trial court's admission of a nonparty declarant's testimony from a suppression hearing in that same criminal case. Because the witness had been both examined by his own counsel and cross examined by a government attorney at the suppression hearing, the Fourth Circuit concluded that there was in fact "equivalent circumstantial guarantees of trustworthiness" to admit the evidence in the criminal trial against the Defendant, the witness' brother. *Id*. at 84-85.

The circumstances of *Clarke* are essentially what also occurred at the BK Racing creditor's meeting. In fact, the circumstances of trustworthiness are stronger in this case. Here, the same factual issues have been previously litigated in this bankruptcy case, mostly with Devine and other Related Case Defendants present, and with Devine testifying. Several of these hearings occurred while the Related Cases were pending—with Devine and the other Related Party Defendants represented by the same attorneys who also represent DiSeveria and Foxboro in this proceeding. Further, as the defense strategies have been all but identical in these cases, each Defendant has had the same motivation as DiSeveria and Foxboro to develop an evidentiary record in their favor. Finally, until now, there has been no question about the matters attested to. However, on this latest occasion and with Ron Devine conveniently absent from the courtroom but on call, there is an objection. The circumstances reveal the objections to be a trial tactic, not heartfelt objections. Given these most unusual circumstances, I conclude that "equivalent circumstantial guarantees of trustworthiness" exist, such that Exhibit 114 should be **ADMITTED.**

*2. Exhibits 17 & 18; Emails between Henderson and Devine*

Similar arguments and legal principles also apply to Exhibits 17 & 18. These emails between Ron Devine and BK Racing's counsel are from the early days of the case pertaining to the preparation (or rather the nonpreparation) of BK Racing's bankruptcy schedules and statements. As before, Smith seeks to use these emails to prove the truth of a fact in controversy—BK Racing's intent to hinder, delay or defraud creditors.[8]

These emails bear on Devine/BK Racing's state of mind at the time the emails were sent and would be admissible for that limited purpose under Rule 803(3). However, for the reasons stated above, these exhibits would also appear admissible under the residual exception of Rule 807 to prove the truth of the matters asserted. Just as with the Devine creditor's meeting testimony, these emails were introduced and explored at multiple case hearings in which Devine attended and/or testified, and hearings between Smith and the Related Case Defendants where parties employed the same legal team as the Defendants. The emails were then admitted without objection and were the subject of detailed competing examinations by parties who are allied with and have had the same motivation as Defendants. *See e.g., Exhibits List*, Case No. 20-03014, Doc. 30, p. 2 (July 14, 2021). Exhibits 17 & 18 are **ADMITTED.**

*3. Exhibits 24, 25, 27, 28, 52; Documents of the Debtor offered to show ownership.*

The exhibits at issue are, variously: emails between BK Racing officials and third parties concerning who owns interests in the company (Ex. 24); correspondence by Devine to third parties about the same (Ex. 25); a PowerPoint presentation prepared by the company for dissemination to others (Ex. 27); a corporate affiliation statement filed by BK Racing as a defendant in a civil action in US District Court (Ex. 28); and emails between Smith, Devine and others concerning ownership of the race charters and the Debtor (Ex. 52).

---

[8] Henderson's statements in the emails are not hearsay, because they are not offered for truth of matters asserted, but simply to show the effect on the Debtor. Fed. R. Evid. 801(c)(2).

These exhibits were offered by Smith in an attempt to show Foxboro's ownership interest in the Debtor during the time of the transfers and refute the Defendants' assertion that they sold their membership interest in December of 2016. The evidence proffered is relevant to the Plaintiffs' claim that the Defendant was an "insider" of BK Racing at the time of the Transfers. Smith seeks to use the Exhibits to prove the truth of the matter asserted: that the Defendants were holders of property interests in the Debtor at the Transfer dates and thereafter.

Statements of ownership of an interest in property are admissible under FRE 803(15) if "they are contained within a document that affects an interest in property, if the statements are relevant to the purport of the document, and if dealings with property since the document was made have not been inconsistent with the truth of the statements." *United States. v. Boulware*, 384 F.3d 794, 807 (9th Cir. 2004) (citing *Silverstein v. Chase*, 260 F.3 142, 149 (2d Cir. 2001)); *see also In re Bay Vista of Virginia, Inc.*, 428 B.R. 197, 218-19 (Bankr. E.D. Va. 2010); *McCoy v. Norfolk Southern Railway Company*, Case No. 2:11-00927, 2013 WL 12250463 at *2 n. 2 (S.D.W.V. 2013).

These emails and correspondence are between individuals holding no public office or do not function as affecting property. While the exhibits speak to the ownership of assets (membership interests), they do not themselves "establish" or "affect" property interests in the way that a recorded deed or assignment does.

Further, DiSeveria was not a speaker in any of the documents in question, nor was he included on any of the correspondence/emails. Smith was a participant in the emails found in Exhibit 58, and he can authenticate those emails and attest to the extent of his receipt of the emails and as to his statements. However, the statements about ownership interests contained within the emails/letter were made by nonparties and are hearsay. Therefore, the emails are not admissible under FRE 803(15).

Exhibit 27 (the PowerPoint), was a document contained in BK Racing's records at the date of Smith's appointment as trustee. Smith may authenticate this document and it is admissible as a business record. *See In re Ballantyne Brands, LLC*, 656 B.R. 117, 138 (Bankr. W.D.N.C. Oct. 2, 2023) (citing *In re Int'l Mgmt. Assocs., LLC*, 781 F.3d 1262, 1267 (11th Cir. 2015)); *see also In re Bernard L. Madoff Inv. Sec. LLC*, 830 F. App'x 669, 671 (2d Cir. 2020).

Smith also argues that Exhibit 52 (Email from Ron Devine to Ryan Dubois regarding the NASCAR Charter Agreement) can be received for the truth of the matters presented due to waiver. Exhibit 52 is the complete set of the communications referenced in Exhibit 25. Smith maintains that the Defendants waived any objection to this exhibit at issue by asking about it on cross-examination.

Under the circumstances presented, I do not agree. Here, the parties agreed to reserve their objections as to the admissibility of documents until after the trial. This necessarily meant that cross examination and rebuttal evidence would be presented as to documents that might themselves prove to be inadmissible. Given this, it would be manifestly unfair to find a waiver.

If not for the truth of the matters asserted—Defendants' ownership interest in BK Racing on the relevant dates—Smith argues that Exhibits 24 (Email chain regarding the Cox lawsuit), Exhibit 25 (the letter to NASCAR), Exhibit 28 (Disclosure of Corporate Affiliations) and Exhibit 58 (email chain relating to Exhibit 25) can be admitted for a limited purpose—to show the Debtor was holding the Defendants out to be owners of BK Racing under FRE 801(c)(2).

That might be true if this were a relevant fact. However, Smith's aim is to prove that Defendants *actually were* owners on the transfer dates. How they may have been held out to others then or on later points in time is irrelevant to our dispute.

Apart from Exhibit 27 and the limited admission of Exhibit 58 described above, these Exhibits are **EXCLUDED**.

4. *Exhibit 35; Iowa City Capital Partner's Answers to Amended Complaint*

Exhibit 35 is offered by Smith to show the Debtor's records may not be reliable as recorded as it pertains to the noted membership interests versus debts. The Exhibit itself is the answer and supporting exhibits of another defendant/former member in another adversary proceeding. The exhibits to that answer consist of a note, certain agreements, etc. that in turn assert facts relating to the investment which are different from the records of the Debtor. Smith claims the document is not being offered to prove the truth of the matter asserted. However, the contents show otherwise. The document's only utility is to offer its own account in substitution for that found in the Debtor's records.

Smith then attempts to argue that promissory notes and contracts are not hearsay. This also fails. The authorities cited by Smith clearly distinguish promissory notes and contracts as non-hearsay for the purpose of proving "the operative fact of that contract's existence." *Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 540 (5th Cir. 1994). The substantive terms within the promissory notes and contracts, the information for which Smith relies upon, are out of court statements offered for the truth of the matter asserted.

Finally, the Plaintiff argues Exhibit 35 is admissible as a business record of the debtor. It is not. It is a pleading filed in another adversary proceeding.

Exhibit 35 is **EXCLUDED**.

5. *Exhibit 37; Emails between Kotwas, Devine, and DiSeveria*

The final disputed exhibit is a three-email exchange: 1) between Devine and his CFO concerning DiSeveria's investment in BK Racing, then 2) between DiSeveria and Devine wherein DiSeveria ratifies Kotwas email statements, and 3) between Kotwas and Devine concerning that investment. Obviously, the second email is not hearsay in that DiSeveria was present at trial and it adopts the information found in the first email. The first and third emails

are hearsay.  However, this exchange was offered by Smith in his cross examination of DiSeveria concerning his investment in BK Racing.  All of it is admissible for impeachment purposes.

Portions of Exhibit 37 are **ADMITTED** as stated.

b. The Transaction Exhibits (Exhibits 19, 20, and 21)

The Transaction Exhibits are summaries made by Smith from bank records.  They show transfers made before bankruptcy by BK Racing to certain Related Case Defendants.  According to Smith, the Transaction Exhibits depict a fraudulent scheme that includes the Defendants.

Defendants say the Transaction Exhibits represent transactions that are not at issue in this lawsuit and in which the Defendants were not participants.  Rather, they are select excerpts of certain bank statements from some of the Debtor's accounts.  The excerpts reflect transfers purportedly made by the Debtor to Ron Devine-controlled entities (BRC Loans, Property Services, and A& R Foods), but are said to hold no probative value here.  Further, according to Defendants, these bank statement records are incomplete and should the Court deem them admissible, the Defendants request that all bank statements from that time period be submitted to give the Court the context of the transactions.

I do not agree with these contentions.  The exhibits in question are relevant to these matters.  Smith has contended in this, and the other Related Cases, that in the run up to bankruptcy, Ron Devine caused BK Racing to intentionally transfer millions of dollars to his business associates and his related entities.  Smith contends these transfers—which include those made to the Defendants—were fraudulent as to creditors.  Further, Smith contends that Devine et. al. concealed these transfers during the bankruptcy case.  Obviously, such a scheme—if it was that—would not be limited to the $277,000 which was paid to DiSeveria.  The evidence found in these exhibits is relevant.

There is no question about the accuracy of the exhibits or that these transfers were made.[9] The Defendants argue that the exhibits are incomplete. Well, yes and no. Obviously, they are not the entirety of the Debtor's bank transactions (although by this point in the case the Court has been shown a large number of BK Racing's bank statements). However, the records are complete in that they contain all of the known prepetition transfers made by BK Racing to these parties. There is no purpose to be served by admitting all of the Debtor's banking records, nor have the Defendants suggested any others that might be germane.

Exhibits 19-21 are relevant and probative because these transactions are alleged by Smith in this and the Related Cases to be part of the widespread fraudulent scheme committed by Devine and his confederates. The exhibits are relevant and probative. They are **ADMITTED**.

## II. Actual Fraudulent Transfers under 11 U.S.C. § 548(a)(1)(A) and N.C. GEN. STAT. § 39-23.4(a)(1).

The Bankruptcy Code and its North Carolina state law analog allow a trustee to avoid a transfer of the debtor's interest in property made within two (four) years of the bankruptcy petition, if the transfer was made "with actual intent to hinder, delay, or defraud" creditors. 11 U.S.C. § 548(a)(1)(A); *see also* N.C. GEN. STAT. § 39-23.4(a)(1).[10] If the requisite intent is established, the transfer is avoidable without regard to whether creditors were actually harmed. *Tavenner v. Smoot*, 257 F.3d 401, 407-08 (4th Cir. 2001).

The trustee has the burden of proving all elements necessary to avoid a Section 548 fraudulent transfer, including the burden of establishing that the transfer was not made for fair equivalent value. *See Cooper v. Ashley Commc'ns, Inc. (In re Morris Commc'ns NC, Inc.)*, 914

---

[9] Once again, these exhibits and the bank records from which they are drawn have been admitted several times in the Related Cases.

[10] There is such a congruity of the two statutes that we will not differentiate between them going forward.

F.2d 458, 466 (4th Cir. 1990). "The Trustee must prove the elements of Section 548 by a preponderance of evidence." *In re Bay Vista of Va., Inc.*, 428 B.R. at 221. So too must a creditor seeking avoidance of a transfer under North Carolina state law. N.C. GEN. STAT. § 39-23.4(c).

a. Transfers.

There is no question that the Transfers made from BK Racing's operating account are transfers of the Debtor's property. Here, the only issue posed under Subsection (a)(1)(A) is whether these Transfers were made by BK Racing "with an actual intent to hinder, delay or defraud" its creditors. 11 U.S.C. § 548(a)(1)(A).

While the Trustee bears the burden of proving all of the Section 548 elements, including the debtor's actual intent, transfers to insiders made without adequate consideration give rise to a presumption of actual fraudulent intent. *Tannever v. Smoot*, 257 F.3d at 407-08.

b. The Defendants were Insiders.

If the debtor is a corporation, "the term "insider" includes- . . . (ii) [an] officer of the debtor . . . ." 11 U.S.C. § 101(31)(B)(ii). Smith argues that the Defendants were insiders, given that DiSeveria was an officer of BK Racing and Foxboro was a member, at the date of the Transfers. Defendants deny this, claiming that Foxboro had previously sold its interest to Virginia Racers Group on December 16, 2016, ending the Defendants' involvement in BK Racing before the first Transfer.

As noted above, the weight of the evidence supports the contention that Foxboro sold its interest in BK Racing to VRG on December 17, 2016. However, apart from DiSeveria's statement, there is no indication in the record that he resigned from being an officer. The Debtor's Amended and Restated Operating Agreement, which were in effect at the time of Transfers, still lists DiSeveria as the Debtor's Vice President and Assistant Secretary. And, BK Racing was holding out DiSeveria as an officer (and Foxboro as an owner) in court filings, tax

documents, communications with NASCAR officials, and in its internal business records well after the alleged sale date.  *See, e.g., Trial Exhibit# 22; Trial Exhibit # 23*; *Plaintiff's Trial Exhibit # 52.*

However, the strongest refutation of DiSeveria's contention is found in an Indemnity and Hold Harmless Agreement (the "Indemnity Agreement") which he signed barely a month later, and just before he received the second Transfer from the Debtor.   On January 24, 2017, DiSeveria, Ron Devine, and supposed member Wayne Press, agreed to indemnify Front Row Motorsports for its $2M purchase of one of BK Racing's NASCAR charters.   Unlike the Sale Agreement, the Indemnity Agreement was notarized.

In the Indemnity Agreement, Devine and DiSeveria represented to Front Row Motorsports that each was an "officer[], member[] or control person[] of BK Racing, LLC." DiSeveria offers no plausible explanation of why he would sign such a document if he had previously resigned as an officer.[11]  The most likely truth of the matter is that while Foxboro sold its interest in BK Racing and DiSeveria had almost no involvement in its operations, technically he remained an officer on the Transfer dates and likely through the date of bankruptcy.

As DiSeveria was an officer, he was a statutory "insider" on the dates of the Transfers.[12] 11 U.S.C. §§ 101(31)(B)(i)-(ii)).  As DiSeveria owned 100% of Foxboro, it was an affiliate of an "insider" and thus also a statutory "insider."  11 U.S.C. §101(2); 11 U.S.C. § 101(31)(E).

c. The Debtor had an Intent to Hinder, Defraud and Delay its Creditors.

Since debtors rarely admit to transferring property with bad intentions, a plaintiff typically demonstrates actual fraudulent intent inferentially, through the existence of various

---

[11] Neither of the alternate designations appear to apply: DiSeveria has never been a member of the Debtor; and on the evidence presented, he was not in any way in "control" of BK Racing.
[12] Additionally, DiSeveria was a close friend of Ron Devine.  While this fact alone would not make him an "insider" under Section 101(31), such friendship is sufficient to constitute a badge of fraud under Section 548(a)(1) fraudulent transfer law. *See infra* Section II(c).

"badges of fraud." *See Whitaker v. Mortgage Miracles, Inc.* (*In re Summit Place, LLC*), 298 B.R.

62, 70 (Bankr. W.D.N.C. 2002) (citing *In re World Vision Entertainment, Inc.*, 275 B.R. 641, 656

(Bankr. M.D. Fla. 2002).  These badges include, but are not limited to:

> 1) whether the transfer was to an insider;
> 2) whether the debtor retained possession or control of the property after the transfer;
> 3) whether the transfer was concealed;
> 4) whether litigation was pending or threatened against the debtor at the time of the transfer;
> 5) a transfer of substantially all of the debtor's assets;
> 6) absconding by the debtor;
> 7) removal or concealment of assets;
> 8) reasonably equivalent value in exchange for the transfer;
> 9) insolvency at the time of the transfer;
> 10) the proximity in time of the transfer to the incurrence of a substantial debt; and 11) a transfer of substantial business assets to a lienor followed by a subsequent transfer of such assets to an insider of the debtor[.]

*Whitaker v. Mortgage Miracle, Inc.*, 298 B.R. at 70 n. 1 (citing *In re Kelsey*, 270 B.R. 776, 782

(10th Cir. B.A.P. 2001).[13]

A single badge of fraud "can warrant a court's conclusion that a transfer was fraudulently

made . . . ." *Zanderman, Inc. v. Sandoval (In re Sandoval*), No. 96-2391, 1998 U.S. App. LEXIS

18559 at *6 (4th Cir. 1998).  However, the badges are not necessarily determinative, and there

will still need to be a subjective evaluation of the debtor's motives.  *In re Jeffrey Bigelow Design

Grp., Inc.*, 956 F.2d 479, 484 (4th Cir. 1992).

Here, several badges of fraud are present, suggesting an actual intention by the Debtor to

hinder delay or defraud its creditors.

---

[13] Under North Carolina law, two additional two badges of fraud are provided: "(12) the debtor made the transfer or incurred the obligation without receiving reasonably equivalent value in exchange for the transfer or obligation, and the debtor reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as they became due; and (13) the debtor transferred the assets in the course of legitimate estate or tax planning."  N.C. GEN. STAT. § 39-23.4.

*1. Litigation & Incurrence of Debts.*

Well before, during, and after the Transfers were made, BK Racing was facing substantial litigation by creditors and tax liens.  It also incurred several large debts in close proximity to the Transfers: i) twenty-four federal tax liens were filed between August 2014 and December 2017, and were left unpaid, (ii) a week before the Debtor began making the Transfers, an arbitrator's award and judgment were entered against it and in favor of Race Engines Plus in the amount of $1,462,648.00, plus interest, and (iii) BK Racing had, in the past year, guaranteed approximately $10 million of Ron Devine's debts owed to UBT, and those loans were in default on the dates of the Transfers.

*2. Insolvency.*

Indisputably, BK Racing was insolvent[14] during the period of the transfers.  The Defendants so stipulate.

*3. Concealment.*

BK Racing concealed the Transfers with the Defendants.  First, it failed to file required bankruptcy schedules and statements wherein it would have been required to disclose prepetition transactions between itself and its insider owners.  Second, Ron Devine testified falsely at the Section 341 creditor meeting saying that no owner loans or capital contributions had been repaid within 4 years of the Debtor's bankruptcy filing.  Third, these Defendants and each of the Related Case Defendants—insiders of the Debtor—resisted formal discovery regarding these and other like transactions, even after being ordered to respond to Smith's interrogatories and production requests.

---

[14] Even the Defendants' defense that the Transfers were loans is premised on the assertion that these were necessary for the Debtor to be able to make payroll.

*4. Removal of Assets.*

Another badge of fraud is found in the "removal . . . of assets . . ." from the reach of creditors. *Whitaker*, 298 B.R. at 70 n.1. Having over $35 million dollars in liabilities, the Debtor nevertheless transferred more than $3.5M to insiders and related parties in the year and a half preceding bankruptcy via transactions that are either unexplained or subject to question. Of that sum, $277,000.00 went to these Defendants.

Clearly, there is something seriously wrong in how the Debtor was operating in the year before bankruptcy. On the evidence presented, BK Racing was "borrowing" money from DiSeveria and others at a time in which it had sizable cash inflows; the sale of one of its NASCAR charters for $2 million, sponsorship revenue, and its prize winnings. On the surface, BK Racing did not immediately need loans from the Defendants just to fund operations.[15]

Upon receipt of these funds, BK Racing was immediately transferring the monies out of its bank accounts. Admittedly, some of that outflow was to pay creditors. In this aspect, BK Racing resembles other distressed companies—bills were due, if not overdue, so payments needed to be made. However, there was something else going on. Sizeable transfers were being made to, and then between, related parties[16] including the Defendants. Thus, on most days, the Debtor had virtually no funds on deposit in its bank accounts. It appears that BK Racing—or more properly, Ron Devine directing its affairs—was moving money out of harm's way to strawmen. The logical purpose of this exercise would be to avoid tax levies and judgment executions. This badge of fraud is established.[17]

---

[15] Had BK Racing been paying all of its debts (like taxes and the REP judgment), it would have certainly needed these monies and more. It was entirely insolvent. We are simply saying that BK Racing didn't require these loans in the short term to continue in the fashion that it had been operating.

[16] In part because of the failures of the Related Case Defendants to make discovery, Smith has been unable to track all of those transfers and retransfers.

[17] Whether DiSeveria was acting as of one, and whether the Transfers were made to him without consideration is considered in our discussion below.

*5. Reasonably equivalent value.*

This badge is disputed and will be discussed below with the constructive fraudulent transfer claim.

The remaining badges of fraud are inapplicable to this circumstance.

Considering the several badges established and the attendant circumstances, Smith has demonstrated the Debtor held a <u>general</u> actual fraudulent intention held by the Debtor towards its creditors in the run up to bankruptcy.  However, this does not necessarily mean that the Transfers to DiSeveria were made with such an intent, nor does it mean that DiSeveria did not provide reasonably equivalent value in exchange.  Finally, this finding does not mean DiSeveria was complicit in BK Racing's efforts to "stiff" its creditors.  That question is considered below in Section III in association with the constructive fraudulent transfer theory, reasonably equivalent value, and the Defendants' Section 548(c) defenses.

## III. Constructive Fraudulent Transfer

Section 548(a)(1)(B) provides in relevant:

"the trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property . . . that was made . . . on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
(IV) made such transfer to or for the benefit of an insider or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).

In short, to succeed on Counts 2 and 4 of his Complaint, Smith must establish: (a) the occurrence of one or more transfers, (b) of an interest of the Debtor in property, (c) made within two (four) years of the petition date, (d) that the Debtor received less than reasonably equivalent value in exchange for such transfer(s), and (e) that the Debtor was either (i) insolvent on the date(s) the transfer or transfers were made, or, (ii) engaged in business or a transaction for which any property remaining with the Debtor was an reasonably small capital.

It is undisputed that (a), (b), (c) and (e) are satisfied in each action, as to each of the Transfers. The parties' fight is really over "reasonably equivalent value."

a. Reasonably Equivalent Value.

The purpose of fraudulent transfer law is the preservation of the debtor's estate for the benefit of its unsecured creditors. *Harman v. First Am. Bank of Md. (In re Jeffery Bigelow Design Grp., Inc.*), 956 F.2d 479, 484 (4th Cir. 1992) (emphasis removed) (quoting Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer Law*, 8 Bankr. Dev. J. 55, 80 (1991)). Thus, our focus is on "the consideration received by the debtor, not on the value given by the transferee." *Harman v. First Am. Bank of Md*, 956 F.2d 479, 484. It follows that the question of reasonably equivalent value is essentially, "'whether, as a result of the transaction, the debtor's estate was unfairly diminished.'" *Field v. United States (In re Abatement Envtl. Res., Inc.)*, 102 F. App'x. 272, 279 (4th Cir. 2004) (quoting Gerrard Glenn, 1 *Fraudulent Conveyances and Preferences* § 275 (rev. ed. 1940)); *see also Harman v. First Am. Bank of Md.*, 956 F.2d 479 at 484.

A two-step inquiry is employed to determine reasonably equivalent value: (1) Did the debtor receive value, and (2) was the payment reasonably equivalent to the value extended? *In re Nelco, Ltd.*, 264 B.R. 790, 813 (Bankr. E.D. Va. 1999) (citing *Mellon Bank v. Official Comm. Of Unsecured Creditors of R.M.L., Inc.* (*In re R.M.L., Inc.*)), 92 F.3d 139, 149 (3d Cir. 1996)).

In performing a reasonably equivalent value analysis, the court focuses on the substance of the transactions rather than their form. *5 Collier on Bankruptcy* ¶ 548.03[6] (Matthew Bender & Co., eds., 16th ed. 2022); *accord Boyer v. Crown Stock Distribution*, 587 F.3d 787, 793 (7th Cir. 2009) (quoting Douglas G. Baird, *Elements of Bankruptcy* 153-54 (4th ed. 2006)) ("'[F]raudulent conveyance doctrine . . . is a flexible principle that looks to substance, rather than form, and protects creditors from any transactions the debtor engages in that have the effect of impairing their rights . . . .'")

"Value" under Section 548(d)(2)(A) includes "satisfaction or securing of a present or antecedent debt of the debtor . . . ." 11 U.S.C. § 548(d)(2)(A). Payments made on account of valid antecedent debts are presumptively made for reasonably equivalent value. *See e.g., Ballantyne Brands, LLC. v. Weisehan*, 656 B.R. 117, 141-42 (Bankr. W.D.N.C. 2023).

There is no question that the Transfers repaid the Deposits made by DiSeveria to BK Racing. There is also no issue that the Transfers largely mirror the amounts previously deposited by DiSeveria. The pertinent question is why these Deposits were made by DiSeveria to BK Racing.

Again, Smith argues that the Transfers were equity transfers, distributions made either to or for the benefit of the Defendants on account of Foxboro's equity interest in BK Racing. If true, this would resolve the reasonably equivalent value inquiry and the fraudulent transfer claims in Smith's favor. It is black letter law that "[d]ividends or other distributions to equity owners in respect of their equity interests are transfers for which the corporation or other entity receives no value." *5 Collier on Bankruptcy*, ¶ 548.05[2][c]; *accord Buncher Co. v. Off. Comm. Of Unsecured Creditors of GenFarm Ltd., (In re Buncher Co.)*, 229 F.3d 245, 252-53 (3d Cir. 2000).

Defendants counter that the Transfers were not returns of equity, but simply repayments of four short-term, informal loans made by DiSeveria to BK Racing.  If loans, and given the dollar equivalence, the "reasonably equivalent value" issue would turn in favor of the Defendants.

Smith does not dispute the fact that DiSeveria made the pre-transfer Deposits.  Rather, he disputes that these were intended by the parties to be, or actually constituted, "loans."  He considers them to be equity infusions or capital calls.  Such Deposits would not create antecedent debts owed by BK Racing, so Smith maintains that the Transfers from the Debtor to the Defendants were made for less than reasonably equivalent value.

Smith's position is largely founded on what didn't exist: There were no promissory notes, written loan agreements, security agreements or collateral securing the deposits.  The Deposits lacked fixed maturity dates and repayment schedules.  The deposits bore no interest rate and no periodic payments were made.  No reasonable creditor would have made loans to the Debtor on similar terms to those the Defendants claim they made, i.e., without any documentation, without any terms, without charging any interest, without specified repayment schedules, and without any security.  The Debtor was undercapitalized at the time of the transactions, in fact, it was insolvent.  There was no sinking fund established for repayment of the deposits made by the Defendants to the Debtor.

Finally, Smith relies on Ronald Devine's sworn testimony at the Debtor's first meeting of creditors.  During that meeting, Devine testified that, "so what happens, what happened is if you don't wanna do it any longer [ie., make investments in BK Racing] and you don't do it enough [it] just fixes the amount of money that you have in your loan account.  It's not a real loan to the company, doesn't have to make payments to it.  It's just an investment that's shown as a loan back.  And that converts into your equity." *Trial Exhibit # 14*, p. 43.

Smith attempts to support his contentions by citation to *Dornier*, a Fourth Circuit case holding that a bankruptcy court may recharacterize a creditor's claims against the estate as equity via equitable subordination if there is a finding of the creditor engaging in inequitable conduct. *In re Dornier Aviation (North America), Inc.*, 453 F.3d 225, 232 (4th Cir. 2006). Dornier instructs the courts to look to a variety of factors including:

> 1) the names given to the instruments, if any, evidencing the indebtedness;
> (2) the presence or absence of a fixed maturity date and schedule of payments;
> (3) the presence or absence of a fixed rate of interest and interest payments;
> (4) the source of repayments;
> (5) the adequacy or inadequacy of capitalization;
> (6) the identity of interest between the creditor and the stockholder;
> (7) the security, if any, for the advances;
> (8) the corporation's ability to obtain financing from outside lending institutions;
> (9) the extent to which the advances were subordinated to the claims of outside creditors;
> (10) the extent to which advances were used to acquire capital assets; and
> (11) the presence or absence of a sinking fund to provide repayments.

*Dornier*, 453 F.3d at 233 (citing *In re Autostyle Plastics, Inc.*, 269 F.3d 726, 750 (6th Cir. 2001)).

However, *Dornier* was not a transfer avoidance action, but rather a proceeding to recharacterize a claim asserted against the bankruptcy estate—essentially a contested matter founded in equitable principles. And as the Defendants note, no published case appears to have applied the *Dornier* test in an avoidance action brought by a trustee seeking to affirmatively recover from a creditor.

Given those differences, I do not believe *Dornier* to be controlling; however, its factors are helpful in that it points out distinctions between equity interests and debt.

Obviously, several of the *Dornier* factors are present. Specifically, the absence of a fixed maturity date and schedule of payments (Factor 2); the absence of a fixed rate of interest and interest payments (Factor 3); the gross inadequacy of BK Racing's capitalization and its insolvency (Factor 5); the identity of interests between the DiSeveria and the minority interest

holder, Foxboro (Factor 6); the lack of collateral for the advances (Factor 7); and the corporation's inability to obtain financing from outside lending institutions (Factor 8). All of these weigh in favor of these being equity transactions.

However, the extent to which the advances were subordinated to the claims of outside creditors (Factor 9), goes the other way. There was no subrogation to any creditor. If anything, BK Racing appears to have preferred DiSeveria in repayment to other unsecured creditors. The same is true for Factor 10, there is no indication that these Deposits were used by BK Racing to acquire capital assets. Rather, the only evidence reflects the Deposits paying operating expenses like payroll. These factors weigh in the Defendants' favor.

Factor 1 (the names given to the instruments) is less clear. Here, there are no instruments—but that fact would appear no more indicative of a loan than an equity distribution. However, for about half of the Deposits, in the memo section of the check, someone has written the word, "Loan." That suggests a debt. Overall, this factor favors the Defendants.

Factor 4 (the source of repayments) is a wash. Whether debt repayment or equity distribution, the Transfers came from the Debtor's operating account.

In short, even if it applied, the *Dornier* Test is inconclusive in this case. It merely highlights the factual arguments which the parties have been making since this action was filed.

More persuasive is the correlation between the individual Deposits and Transfers, where the amounts advanced and repaid largely track one another at intervals of about one month. This was also supported by DiSeveria's testimony. DiSeveria credibly explained that on several occasions during in the Spring of 2017, Ron Devine asked him to make short-term advances to BK Racing to help it pay its operating expenses: in particular, payroll. DiSeveria stated that he could relate to the Debtor's situation as he had experienced a similar wintertime cash flow issues with his own businesses. He agreed to loan the Debtor money and did so by making monthly

short-term loans to the Debtor through April of 2017. Each was repaid in about a month's time. Then, after the Debtor failed to repay DiSeveria $63,000 it had borrowed the month before, DiSeveria declined to make any further loans.

The only extrinsic evidence available also tends to support DiSeveria's account. First, as noted, the word "loan" appears on the memo line of the checks constituting Deposits 2, 3, 6, and 7. Second, and while Smith does not view the Debtor's books and records as being accurate or its accounting practices entirely proper, BK Racing actually booked these transactions as loans. In its general ledger, each of the Deposits is treated as a loan. The related Transfers are booked as loan repayments. The Debtor's books do not treat any of the Transfers as equity payments or dividends. In fact, the Debtor's ledger doesn't even contain an equity account for DiSeveria or Burger King #19987 (the source of Deposit). *See Trial Exhibit #29; Trial Exhibit #93.*

Meanwhile, Foxboro, as a 4% member, did have an equity account in the Debtor's ledger. However, the relevant ledger evidences no increases or decreases corresponding to the amounts of the Deposits and alleged Transfers. None of the Schedule K-1s issued by the Debtor to Foxboro reveal any distribution from the Debtor to Foxboro, nor was Foxboro the subsequent transferee of any Transfer made by the Debtor to DiSeveria.

And as to Devine's seemingly damning testimony at the creditors meeting (to-wit, the equity contributions were treated as loans), those statements appear to be about the members' purchases of their interests in BK Racing well before the Transfers. In his testimony, Devine did not specifically mention the Deposits made by DiSeveria in the Spring of 2017 or the repayments. So, even if admissible, these statements are so general as to be nonprobative as to DiSeveria.

The weight of the evidence suggests that the Deposits were, in fact, short-term loans to the Debtor and that the Transfers repaid reasonably equivalent debts owed to DiSeveria.  Thus, the constructive fraudulent transfer action fails.

b. As Loan Repayments, the Actual Fraudulent Transfer Claim also Fails.

Returning to the actual fraudulent transfer claims, my conclusion is that BK Racing actually borrowed money from DiSeveria and then repaid him.  Thus, it is hard to see how the Transfers could be considered as being made with "an actual intent to hinder, delay, or defraud creditors."  Admittedly, there are serious concerns about what BK Racing and Devine were up to during this period of time—with the substantial monies entering and then quickly leaving the Debtor's bank accounts.  However, in contrast to some of the Related Case Defendants, there is no question that the monies advanced to BK Racing actually belonged to DiSeveria.  Nor is there any reason to believe DiSeveria was serving as a strawman for Devine or was an active participant in these activities.

Similarly, it does not appear that DiSeveria had actual knowledge that the Transfers were potentially avoidable.  From its inception, BK Racing had operated while sustaining major financial losses.  In 2014, DiSeveria remarked on being impressed that BK Racing was able to operate with so little profit. *Trial Exhibit # 41*.  Certainly, the Defendants had knowledge of the poor financial condition of the Debtor, yet they also witnessed BK Racing continue to operate for three more years.  Further, the Debtor continued to pay back the short-term loans with relative timeliness until the final Transfers remained unpaid, at which point the Defendants stopped extending funds.  Given these circumstances, it is plausible that the Defendants had no actual knowledge nor any reason to constructively know the Transfers were potentially avoidable.

Because the Debtor asked for, received, and then repaid the DiSeveria Deposits, I cannot find that the Transfers to have been made by BK Racing with an intention to hinder, delay and

defraud its creditors.    At best, some of the Transfers may have been "preferential" in that DiSeveria was repaid while outside creditor checks were bouncing.    However, Smith has not asserted a Section 547 claim, and even if he had, it would likely be subject to defenses.[18]

<u>c. Both Transfer Theories Fail as to Foxboro.</u>

Meanwhile, Foxboro received no transfers from the Debtor.    As the Transfers were not made on account of Foxboro's membership interest, did it not receive any tangible benefit from the Transfers made to DiSeveria.    Thus, as to Foxboro, the Transfers are not avoidable under Section 548.

**CONCLUSION**

The weight of the evidence suggests that the Transfers were made in payment of short-term loans; DiSeveria extended a loan, BK Racing used that money, and then BK Racing would repay DiSeveria in the following weeks.    When it comes to these particular Transfers, the evidence suggests there was no "actual intent to hinder, delay, or defraud" creditors.    Repayment of loans (antecedent debts) in amounts substantially equivalent to the amount of the Transfers constitutes "reasonably equivalent value."    Moreover, DiSeveria has successfully demonstrated defenses to the Transfers under Section 548(c) in that he gave reasonably equivalent value to the Debtors and did so with good faith as to the avoidability of the received transfers.    Therefore, Smith has failed to demonstrate that the Transfers constituted actual or constructive fraudulent transfers.

As to Foxboro, because it received none of the Transfers, and the Transfers do not appear to be on account of Foxboro's small equity interest in the Debtor, I cannot find that the Transfers were either "to, or for the benefit of," this Defendant.    As a result, the Plaintiff cannot avoid the

---

[18] The first three Transfers are beyond the maximum 1-year reach back period.  And the amounts of the remaining two Transfers are less than the two advances DiSeveria made to the Debtor, but were not repaid.  They would likely constitute Section 547(c)(4) "new value."

Transfers or recover their worth from the Defendants.  Judgment of Dismissal with prejudice will

be entered in favor of Defendants.

**SO ORDERED**.


**This Order has been signed electronically.**          **United States Bankruptcy Court**
**The Judge's signature and Court's seal**
**appear at the top of the Order.**